IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 09-cv-01864-MEH-KMT

MICHAEL RYSKIN,

      Plaintiff,

v.

BANNER HEALTH, INC., an Arizona non-profit corporation,
MICHELLE JOY,
SHIRLEY NIX,
THOMAS SOPER,
JOSEPH BONELLI, and
JOHN ELLIFF,

      Defendants.

---

## ORDER ON MOTION FOR SUMMARY JUDGMENT

---

**Michael E. Hegarty, United States Magistrate Judge.**

      Before the Court is Defendants' Joint Motion for Summary Judgment [filed August 30, 2010; docket #76].   By Order of Reference to United States Magistrate Judge, this matter has been referred to me to conduct proceedings in this civil action pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  The matter is fully briefed, and the Court orders that, for the reasons that follow, the motion is **granted in part and denied in part**.

## STATEMENT OF MATERIAL FACTS

      1.      Plaintiff is an obstetrician/gynecologist ("OB/GYN") who was employed by Banner Health, Inc. ("Banner") to provide services at Sterling Regional MedCenter (SRMC) pursuant to a contract dated July 5, 2005.  Final Pretrial Order, Stip Fact 4.3.  In 2007, the contract was renewed for an additional two years until July 5, 2009.  *Id.*, Stip Fact 4.4.

      2.      At the time Banner hired Plaintiff, Michael Gillen was the Chief Executive Officer

at SRMC.  *Id.*, Stip Fact 4.6.

3.      In early 2006, Plaintiff discussed with Gillen his intention of becoming an independent practitioner in the community.  Gillen was supportive and approved the idea; thus, Plaintiff filed for a professional corporation in Sterling.  Defs. Exh. A-5 at 40: 2-11.

4.      At or about the same time, Plaintiff met with Banner's Chief Financial Officer, Pam Steib, to discuss potential expenses in using Banner as a primary vendor and tenant.  *Id.* at 40: 12-25.

5.      Plaintiff sought to offer liposuction services to women in Northeast Colorado; thus, he approached Gillen, who approved the idea and allocated $7,000.00 for Plaintiff's training in 2006.  Plaintiff applied for and received privileges to perform liposuction services but never actually performed the services.  *Id.* at 47: 22-25, 48: 1-18.

6.      In November 2006, Plaintiff's hospital privileges were renewed for a two-year period ending November 21, 2008.  Pl. Exh. 2 at 19: 21-25; Defs. Exh. A-28, docket #79-36.

7.      In the absence of problems or concerns and if the physician's record is "clean," reappointment and renewal of privileges is usually for a term of two years.  Pl. Exh. 2 at 22: 7-17.

8.      SRMC is obligated, by law and accreditation standards, to have quality management and professional review processes in place for continued quality assurance and improvement of care.  Final Pretrial Order, Stip Fact 4.7.

9.      SRMC has adopted Bylaws of the Medical Dental and Podiatric Staff; included in those bylaws is a section relating to the creation and duties of a Peer Review Committee.  Defs. Exh. A-26, docket #79-26.

10.      Article 13 of the Bylaws incorporates the referenced rules and regulations, fair hearing plan, professional review/corrective action plan and other medical staff policies.  *Id.*; *see also* Pl. Exh. 4 "Medical Staff Focused Review Process (Peer Review Policy)"; Pl. Exh. 6

"Professional Review/Corrective Action Plan"; Pl. Exh. 7 "Fair Hearing Plan of the Medical, Dental and Podiatric Staff."

11.     The stated purpose of the Peer Review Policy, which was in place at all times relevant to this matter, is "to guide the Medical Staff through an objective peer review process to maintain quality patient care, facilitate education, and improve performance at Sterling Regional MedCenter."  Pl. Exh. 4; Pl. Exh. 2 at 12:3-13.

12.     The Peer Review Policy states that a physician will be notified and asked to attend a committee meeting if he or she has a case that has been initially reviewed and found to have a "problem" defined by the policy.  Pl. Exh. 4.

13.     Defendant Nix served on the SRMC Peer Review Committee at all times relevant to this matter.  Final Pretrial Order, Stip Fact 4.8.  Defendant Bonelli served on the Peer Review Committee in 2007.  Defs. Exh. D.

14.     The peer review process is not a disciplinary process.  Pl. Exh. 4.  Rather, "[d]isciplinary actions are processed through the Medical Executive Committee in accordance with the Medical Staff Bylaws, Professional Review/Corrective Action Plan, Fair Hearing Plan and Medical Staff policies."  *Id.*

15.     Defendants Nix, Soper, Bonelli and Elliff served on the Medical Executive Committee ("MEC") at the SRMC at all times relevant to this matter.  Final Pretrial Order, Stip Fact 4.8.

16.     SRMC also has a Credentials Committee with responsibility for ensuring that providers allowed to practice in the facility have the appropriate credentials and training to ensure patient safety. Pl. Exh. 2 at 16: 13-18.  The committee is responsible for reviewing applications for credentials and privileges and makes recommendations for approval or disapproval of such

applications to the MEC. *Id.* at 19: 8-10; Pl. Exh. 3 at 30: 6-25, 31: 1-5.

17.     Defendant Nix served on the Credentials Committee for all times relevant to this matter. Pl. Exh. 2 at 8: 3-8.

18.     In late fall 2007, Plaintiff received a letter from Nix notifying him that two of his cases were sent out for external peer review. Defs. Exh. A at 80: 16-25; Pl. Exh. 1 at 81: 1-10. The Plaintiff believed it was a letter of information, which was "very dry and descriptive" and contained the names of patients and the issues presented. Pl. Exh. 1 at 81: 11-25.

19.     The outside review, performed by a board-certified OB/GYN, reflected a Standard of Care Determination of "Q-3: An occurrence in the medical/surgical care or process; significant or potentially significant impact on patient morbidity; opportunity for improvement" for both cases. Defs. Exh. B.

20.     At a November 6, 2007 meeting, the MEC considered the outside review and a report by Nix of other issues, including Plaintiff's alleged failure to make daily rounds of his patients. Defs. Exh. C. The committee recommended that (1) Plaintiff be made aware of the findings, (2) the Peer Review Committee review all information about Plaintiff's performance, as well as the external reviewer's report; and (3) Plaintiff's practice information should be reviewed, including complication rate, length of stay, and readmissions within 30 days. *Id.*[1]

21.     The SRMC CEO, Michelle Joy, verbally notified the Plaintiff that responses were received from the external review, that they were negative, and that he should expect to receive a letter from the MEC. Pl. Exh. 1 at 83: 4-14. The Plaintiff was alarmed because he had not been involved in the process and, now, he was expecting to receive a letter of discipline from the MEC. *Id.* at 14-25.

---

[1]Defendants contend that the MEC made further recommendations, but the meeting minutes provided reflect only those recommendations listed herein. *See* Defs. Exh. C, docket #75-3.

22.     At a November 27, 2007 meeting, the Peer Review Committee considered the external review and other issues raised concerning Plaintiff's practice.  Defs. Exh. D.  The committee assigned several fact-finding "actions" and recommended that documentation be gathered to support the issues raised and that all matters be referred to the MEC for further action.  *Id.*

23.     Plaintiff expressed concerns that he was not involved in the peer review process to Lisa Sanford, CNO at SRMC.  Pl. Exh. 1 at 85: 13-25, 86: 1-6.  Plaintiff learned that the next meeting of the MEC would be the following day, December 4, 2007.  *Id.* at 86: 19-25, 87: 1-12.  At Ms. Sanford's suggestion, Plaintiff contacted Dr. Elliff to speak with him before the meeting.  *Id.*

24.     Elliff did not discuss the details of the issues raised by the peer review process with the Plaintiff before the meeting.  Pl. Exh. 1 at 92: 3-14.  Elliff instructed Plaintiff to wait for the outcome of the meeting.  *Id.* at 92: 24-25, 93: 1-2.

25.     At the December 4, 2007 meeting, the MEC considered the Peer Review Committee report and concerns raised by certain physicians about the Plaintiff's work, including:

a.     Dr. Faycal expressed concern about a patient with high blood pressure who was told by Plaintiff that she could not take high blood pressure medicine.  The patient miscarried at 24 weeks and was very dissatisfied with Plaintiff.

b     Dr. Nix reported dissatisfaction with Plaintiff's care of one of her patients because Plaintiff did not examine the patient despite the presence of a mass, which subsequently enlarged.

c.     Dr. Soper reported a concern that Plaintiff discontinued his care of a patient upon requesting a consultation from Dr. Soper.  Plaintiff referred to the patient as a "f'ing whore and a c-u-n-t and that she was nuts, crazy, and didn't need to be in the hospital."  Dr. Soper, however, believed that the patient "wasn't any of those things. She was sick, and you know, needed help."

     d.     Dr. Allen, who had come to SRMC to assist over the Thanksgiving holiday, complained about Plaintiff's hand-off of patients.

It was also reported to the MEC that nursing staff complained about Plaintiff failing to make daily rounds of patients, and that Plaintiff was performing circumcisions without privileges and with improper equipment.  Defs. Exh. E; Defs. Exh. G; Ex. H; Ex. I.

     26.     The MEC also considered a number of patient complaints including:

     a.     A patient awaiting emergent surgery complained about overhearing Plaintiff "cussing and stating how mad he was to be in surgery at 3:00 am."

     b.     A complaint that "the doctor I had an appointment with was very rude! When I asked a question, he told me not to concern myself and kept talking to his nurse."

     c.     A complaint that Plaintiff did not come to see a patient "until the next day after I was admitted."

     d.     A complaint from a patient with an ovarian mass that Plaintiff was rude and did not examine her.

     e.     A complaint that Plaintiff "never answered my questions or explained anything."

Defs. Exh. J.

     27.     The MEC held a special meeting with the Plaintiff after the meeting during the evening of December 4, 2007.  The committee provided the Plaintiff with a copy of the external review, and he responded with detailed explanations of his care and why he believed the review was incorrect.  Pl. Exh. 1 at 93: 8-25, 94:1-25, 95: 1-11.

     28.     Because he was not provided any documentation to review before the meeting, the Plaintiff also addressed a follow-up letter to the MEC on December 11, 2007 providing additional

information and explanations concerning the issues raised.  Defs. Exh. L.  In that letter, Plaintiff also expressed his concerns regarding the peer review process.  *Id.*

29.     Satisfied with Plaintiff's response to the concerns raised at the December 4, 2007 meeting, the MEC sent Plaintiff a letter.  Final Pretrial Order, Stip Fact 4.17.  The December 18, 2007 letter to Plaintiff, drafted by Elliff, described the purpose of the December 4, 2007 meeting as having a "colleague to colleague discussion," informed Plaintiff that the December 11, 2007 letter would be reviewed at the MEC's next meeting, and reminded him of his obligations under bylaws, rules and regulations of SRMC.  Defs. Exh. M.

30.     The MEC informed Plaintiff that the 2007 proceedings were informal discussions, not an investigation.  Final Pretrial Order, Stip Fact 4.18.

31.     After thinking about the December 18, 2007 letter, the Plaintiff "realized that the entire ordeal was a travesty, yet it was in full compliance with the bylaws."  Defs. Exh. A at 128: 23-25, 129: 1-5.  Thus, the Plaintiff sought to make changes to the SRMC bylaws.  *Id.* at 129: 11-12; 130: 11-14.

32.     In early 2008, Plaintiff introduced the concept of a Physician's Council to Soper and the entire medical staff.  The Medical Staff approved the creation of the Council.  Final Pretrial Order, Stip Fact 4.19.

33.     According to the SRMC bylaws any amendments to the bylaws need to be approved by the Banner Board of Directors.  Final Pretrial Order, Stip Fact 4.20.

34.     Because he believed the bylaws were not in compliance with the law, Plaintiff proposed, first to Elliff then to Soper and the entire medical staff in March 2008, amending the bylaws by creating a Physician's Council to investigate reports of physician misconduct before such allegations were referred to the MEC for discipline; disallowing service as Chair of more than one

committee; rotating committee chairs annually; and creating an online Physician's Forum where staff who could not conveniently attend meetings in person could participate in meetings, discussions and remote voting, thereby increasing the number of physicians involved in quality of care at SRMC.  Pl. Exh. 18 at ¶ 45, ¶ 46.

35.     Soper agreed that the Physician's Council was a good idea and worked with Plaintiff to draft the bylaws amendment.  Pl. Exh. 3 at 96: 20-25, 97: 1-3.

36.     On March 25, 2008, Nix wrote a letter to Elliff stating, "I agree with Dr. Ryskin that the peer review process needs revised. I do think that forming a peer counsel as a step prior to referral to medical executive committee is a good one. I also agree that the entire medical staff needs to have a part in supporting this facility, not just a few who feel honor bound."  Pl. Exh. 31.

37.     At the June 12, 2008 General Staff Meeting, the proposed bylaws amendment was presented to the medical staff and formally passed by vote.  Pl. Exh. 18 at ¶ 49; Pl. Exh. 3 at 97: 16-21.

38.     SRMC management never submitted the amendment to the Banner Board of Directors for discussion and/or disposition.  Pl. Exh. 9 at 2, ¶ 1.

39.     SRMC requires that physicians reapply for privileges every two years.  The standard appointment period is two years.  In November 2008, Plaintiff's medical staff privileges at SRMC would have expired.  Therefore, in April 2008, Plaintiff reapplied for medical staff privileges at SRMC.  Final Pretrial Order, Stip Fact 4.21.

40.     After completing his application, Plaintiff received a call from the medical staff office about his answer to question #2 on page 28 of his application in which Plaintiff answered "no" to a question as to whether there had been any "proceedings or investigations" relating to his "clinical competence ... or professional conduct."  Final Pretrial Order, Stip Fact 4.22.  Fleurette Groves,

Medical Staff Services Manager, told Plaintiff on October 10, 2008 that, based on his current file, he would need to correct his answer to "yes." Pl. Exh. 20. Plaintiff refused to do so. *Id.*

41.     Plaintiff's application and file were then forwarded to the Credentials Committee. Final Pretrial Order, Stip Fact 4.23. The committee recommended that Plaintiff "not be reappointed" with a comment that "he answered no about previous proceedings/investigations." Defs. Exh. A-28, docket #79-36. The matter was then referred to the MEC. Final Pretrial Order, Stip Fact 4.23.

42.     In the fall 2008, complaints arose concerning Plaintiff's use of privileged and confidential peer review information, his interactions with patients and their families, and his relationship with medical staff members and hospital staff. Defs. Exhs. N-Q, S, V.

43.     In a November 4, 2008 meeting, the MEC reviewed the Credentials Committee recommendation not to reappoint the Plaintiff. Pl. Exh. 28. The MEC recommended that the Banner Board of Directors reappoint the Plaintiff for a period of three months, November 21, 2008 through February 21, 2009, "during which time the MEC [would] schedule a meeting with [Plaintiff] to discuss recent patient complaints and disruptive behavior complaints as well as his answer to the application question pertaining to current or past investigations/proceedings of clinical competence or professional conduct." *Id.*

44.     This recommendation was accepted by the Banner Governing Board. Final Pretrial Order, Stip Fact 4.24.

45.     On November 17, 2008, Joy wrote to Plaintiff informing him that his request for reappointment to the SRMC Medical Staff and for renewal of his clinical privileges was granted for a period of three months. Defs. Exh. T. Joy stated, "[t]his action was taken in order to afford the [MEC] the opportunity to address several outstanding issues that have arisen during the last few months regarding your professional conduct and clinical practice at SRM. The [MEC] will be

scheduling a meeting with you shortly to discuss these issues in more detail." *Id.*

46.     On November 18, 2008, Plaintiff responded to Joy seeking review and investigation by the Physician's Council in accordance with the recently amended bylaws.  Pl. Exh. 26.  Plaintiff also requested that he be provided a detailed description and supporting documentation of the identified issues, "as [he] had not been approached with any questions or concerns regarding [his] conduct and [was] unaware of any." *Id.*

47.     On December 3, 2008, Elliff wrote to the Plaintiff on behalf of the MEC inviting him to attend a special meeting "as part of an informal, confidential intra-professional review process, prior to making any final recommendations." Defs. Exh. V.  Elliff further informed the Plaintiff that "no formal investigation has been initiated and no adverse action has been taken"; thus, Elliff asserted, Plaintiff was "not yet entitled to exercise any of the rights under the Medical Staff Professional Review/Corrective Action Plan or the Fair Hearing Plan." *Id.*  Furthermore, Elliff notified the Plaintiff that the proposed changes to the bylaws had not yet been approved by the governing board of Banner, and the MEC was the appropriate committee to address the outstanding issues. *Id.*

48.     At Joy's request, Plaintiff met with Joy on December 9, 2008 regarding the outstanding issues.  Pl. Exh. 14 at 59: 7-20.  Joy informed Plaintiff of the complaints raised against him, and Plaintiff expressed his displeasure with Joy's performance as CEO. *Id.* at 60:17 - 63:13; Pl. Ex. 1 at 173:10 - 175:25.

49.     During the meeting, Joy and Plaintiff mutually agreed to execute the 90-day termination notice of Plaintiff's contract with Banner so long as the MEC would take no further action on the outstanding issues.  Pl. Exh. 14 at 68: 24-25, 69: 1-10; Pl. Exh. 1 at 176: 18-24.

50.     The following day, December 10, 2008, Joy informed Plaintiff by email that the MEC

would still need to meet with the Plaintiff informally "to bring closure to the medical staff side of things."  Defs. Exh. X.  Joy gave Plaintiff the choice of meeting with the MEC or with Doug Webster, SRMC Medical Director.  *Id.*

51.     Plaintiff responded that the "[m]eeting on Friday will void the agreement we came to yesterday."  *Id.*  Joy replied that since the "[e]mployment contract and medical staff are two separate issues," she "did not have the authority to overrule the decision of the [MEC] for an informal meeting."  *Id.*  Plaintiff responded, "I understand. I will meet with Dr. Webster."  *Id.*

52.     On December 11, 2008, Plaintiff wrote a letter to Joy, Webster and members of the MEC referring to the termination of his contract saying, "Let us document that it will be a unilateral action taken by Banner Health, Inc. and I made no requests to [Joy] or to any of you as conditions for this action."  Pl. Exh. 15.

53.     That same day, Plaintiff met with Dr. Webster.  Webster memorialized this meeting in a January 6, 2009 memo to the MEC (copied to Joy) in which he recommended that "the MEC consider the accusations presented and a pattern of behavior agreed upon, which, if followed, would prevent further similar issues from arising."  Pl. Exh. 16.  Further, Webster recommended that "as the issues represent uninvestigated accusations and as there were no documented adverse clinical outcomes involved, the MEC should consider the issues closed."  *Id.*  The Plaintiff presented his letter to Webster at the meeting.  *Id.*

54.     The December 12, 2008 special meeting with the MEC was canceled.  Defs. Exh. A-38.

55.     By letter dated December 22, 2008, Joy notified Plaintiff of Banner's termination of his Physician Employment Agreement effective March 25, 2009, pursuant to Section 7.2 of the contract.  Defs. Exh. A-39, docket #79-47.

56.     On January 7, 2009, Soper wrote a letter to Plaintiff informing him that the MEC reviewed the information provided by Webster and "concluded that the outstanding issues have been satisfactorily addressed and are considered closed." Defs. Exh. A-40, docket #79-48.

57.     Plaintiff's request for Medical Staff membership and clinical privileges were extended to March 25, 2009 at Plaintiff's request to be consistent with the notice of termination of Plaintiff's contract with Banner. *Id.*

58.     Plaintiff did not apply for any additional extension of his hospital privileges, because he did not want to give the MEC an opportunity to deny them. Pl. Exh. 18 at ¶ 68.

59.     Prior to and upon leaving his employment with Banner, Plaintiff never spoke with Joy, or her successor Lemming, about starting a private practice in Sterling. Defs. Exh. A-5 at 163: 18-23. In addition, Plaintiff never spoke with Nix, Bonelli or Elliff about starting a private practice in Sterling. *Id.* at 313: 14-25, 314: 1-9; 342: 8-11; 361: 5-8.

60.     In 2008, Plaintiff put his plans to open a private practice on hold. *Id.* at 161: 25, 162: 1-3. He wanted to see what would happen, because Joy was the fourth CEO he had worked with since joining Banner in 2005. *Id.* at 162: 3-5.

61.     In 2008, Plaintiff renewed his applications with locum tenum agencies, which place physicians in temporary positions. *Id.* at 224: 4-13.

62.     Plaintiff never signed a lease for office space for a private practice in Sterling, did not attempt to secure medical malpractice insurance, and did not complete applications for health insurance panels, which would enable him to receive reimbursement for patient care. *Id.* at 298: 2-23; 306: 24-25, 307: 1-2; 307: 9-13; 312: 6-14.

63.     Plaintiff later told an employment recruiter that he had not had any adverse action as to his clinical privileges. Defs. Exh. DD at 320: 15-20.

## DISCUSSION

## I.      Standard of Review

Summary judgment serves the purpose of testing whether a trial is required. *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the initial responsibility of providing to the Court the factual basis for its motion and identifying the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which reveal that there are no genuine issues as to any material facts, and that the party is entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  However, the non-moving party has the burden of showing that there are issues of material fact to be determined. *Id.* at 324.

That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002).  These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324).  "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005).  "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of*

*Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

**II.     Analysis**

Plaintiff brings claims of wrongful discharge in violation of public policy against Banner Health; intentional interference with contract and intentional interference with prospective business relations against the individual Defendants; and conspiracy against all Defendants.  The Court has already ruled that Banner is immune from suit with respect to the conspiracy claim, and that the individual Defendants are partially immune from suit with respect to the interference and conspiracy claims, only to the extent they arise from the 2007 peer review proceedings.  The Court will now proceed to determine whether disputed facts material to the determination of Plaintiff's claims exist for the case to proceed to trial.

A.     Wrongful Discharge in Violation of Public Policy

Plaintiff alleges that Banner terminated him for "insisting on the proper use of the peer review process," claiming specifically that because he "attack[ed] the fairness, propriety and validity of the peer review proceedings" Banner ultimately terminated his employment "as a consequence of those improper 'proceedings' and 'investigations' and his actions in opposing them."  Docket #90 at 36-37.

The Colorado Supreme Court has held that an at-will employee has a claim for wrongful discharge "if the discharge of the employee contravenes a clear mandate of public policy." *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 107 (Colo. 1992).  The identification of a statute, constitutional provision, or other source as a sufficiently clear expression of public policy is an issue of law for the court.  *Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 521 (Colo. 1996).

The *Lorenz* court set out four elements of a public policy wrongful discharge case:

• the employer directed the employee to perform an illegal act or prohibited the

14

employee from performing a public duty or exercising an important job-related right or privilege;

• the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or the employee's rights or privileges as a worker;

• the employee was terminated as a result of refusing to perform the act directed by the employer; and

• the employer was aware, or reasonably should have been aware, that the employee's refusal to comply with the order was based on the employee's reasonable belief that the action ordered by the employer was illegal, contrary to clearly expressed statutory policy relating to the employee's duty as a citizen, or violative of the employee's legal rights or privileges as a worker.

*Lorenz*, 823 P.2d at 109.   Here, Plaintiff claims that Banner terminated him in retaliation for exercising "important job-related rights" in participating in peer review and opposing alleged improper peer review practices.   The purpose of the public policy exception in this instance is to ensure that, in order to keep his or her job, an employee is not required to forsake an important public duty (such as whistle-blowing) or to forgo a job-related right or privilege.   *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 667 n.2 (Colo. 1999) (citing *Lorenz,* 823 P.2d at 109).

The public policy supporting a wrongful discharge claim "must concern behavior that truly impacts the public in order to justify interference into an employer's business decisions."   *Mariani,* 916 P.2d at 525.   "Although public-policy wrongful discharge is not subject to precise definition, it has been variously described as an action that involves a matter that affects society at large rather than a purely personal or proprietary interest of the plaintiff or employer, leads to an outrageous result clearly inconsistent with a stated public policy, or strikes at the heart of a citizen's social rights, duties, and responsibilities."   *Crawford Rehabilitation Servs., Inc. v. Weissman*, 938 P.2d 540, 552 (Colo. 1997) (internal citations and brackets omitted).

15

Few sources of public policy have been recognized in Colorado to support a wrongful discharge claim. *See id.* at 553 ("Not all potential sources of public policy are of sufficient gravity to outweigh the precepts of at-will employment. We must develop the common law in this area with care."). An employee must prove that "the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's rights as a worker ...." *Mariani,* 916 P.2d at 524 (citing *Lorenz,* 823 P.2d at 109).

Plaintiff cites the Health Care Quality Improvement Act, 42 U.S.C. § 11101, *et seq.* ("HCQIA") and the Colorado Professional Review Act, Colo. Rev. Stat. § 12-36.5-101, *et seq.* ("CPRA") as sources of public policy supporting his wrongful discharge claim. "Statutes by their nature are the most reasonable and common sources for defining public policy." *Flores v. American Pharm. Servs., Inc.*, 994 P.2d 455, 458 (Colo. App. 1999). The *Flores* court warns, however, that "[a]ny public policy must serve the public interest and be sufficiently concrete to notify employers and employees of the behavior it requires. Therefore, the provision must provide a clear mandate to act or not to act in a particular way." *Id.*

The HCQIA was enacted to respond to (1) "the national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance," and (2) "the national need to provide incentive and protection for physicians engaging in effective professional peer review." 42 U.S.C. §§ 11101(2) and (5) (2010). Thus, the HCQIA encourages professional (peer) review to respond to the first need and provides qualified immunity to peer review participants to respond to the second. *Id.*; *see also* 42 U.S.C. § 11111 (2010); *Hancock v. Blue Cross Blue Shield of Kan., Inc.*, 21 F.3d 373, 374-75 (10th Cir. 1994) ("the court concludes that Congress merely intended, in enacting HCQIA, to ensure effective professional peer review of physician competence by providing

16

immunity from damage suits to those professional peer review groups that comply with the HCQIA").

The CPRA's purposes are similar to the HCQIA's and include protection of the public's health, safety and welfare by regulating competition and unprofessional conduct; use of professional review committees to assist the state board of medical examiners; provision of certain immunities to those participating in peer review proceedings; and encouragement of physicians to participate in peer review proceedings. *Kauntz v. HCA-Healthone, LLC*, 174 P.3d 813, 818 (Colo. App. 2007), *cert. denied*, 2008 WL 115540 (Colo. Jan. 14, 2008).

Although both statutes "encourage" health care facilities and providers to engage in professional peer review, neither statute requires it. Nor do the statutes require that, for those providers who engage in peer review, the proceedings provide "due process" protections to the physician under review. Rather, the statutes simply grant immunity to those who choose to engage in such procedures. Thus, the statutes do not "provide a clear mandate to act or not to act in a particular way." *See Flores*, 994 P.2d at 458.

Moreover, the statutes do not clearly articulate a public policy by establishing "a public duty," the disregard of which would undermine "the employee's basic responsibility as a citizen." *Jaynes v. Centura Health Corp.*, 148 P.3d 241, 246 (Colo. App. 2006), *cert. denied*, 2006 WL 3479328 (Colo. Dec. 4, 2006) (quoting *Lorenz*, 823 P.2d at 109). While the statutes recognize "national needs" in reducing physician incompetence and providing protection to physicians engaged in peer review, the statutes do not go so far as to mandate public duties on the part of health care providers to review their peers' medical competence.

Further, the statutes do not clearly articulate a public policy by creating "important job-related rights or privileges." *See id.* at 246 (citing *Hoyt v. Target Stores,* 981 P.2d 188, 191 (Colo. App. 1998) (right to be paid for travel time from store to store protected by the Colorado Wage

Claim Act) and *Lathrop v. Entenmann's, Inc.*, 770 P.2d 1367 (Colo. App. 1989) (right to file workers' compensation claim)).  The statutes mention nothing about a physician's employment status or job security.  Because peer review proceedings are not mandated, but only encouraged, the statutes create no rights for employees to participate or to have "due process" protections in them.

Finally, while the statutes relate "to health, safety, or public welfare," the HCQIA can only be violated for failure to report adverse professional review actions and for disclosures of confidential information, both of which are not issues in this case.  *See Jaynes*, 148 P.3d at 246. Instead, failure to comply with the statutes' peer review provisions simply results in denial of immunity to damages or suit.  Consequently, even assuming that Banner retaliated against Plaintiff for attempting to amend the bylaws' peer review procedures, and "further assuming that such retaliation would chill other employees who might do so in the future, their silence, albeit coerced, would still not 'violate a specific statute.'"  *Id.* (citing *Lorenz,* 823 P.2d at 109).

Plaintiff cites no case, and the Court has found none, recognizing the HCQIA or CPRA as sufficient public policy to sustain a wrongful discharge action.  Rather, other states have declined to extend the public policy supporting wrongful discharge claims to include the same or similar peer review statutes.  *See, e.g., Lurie v. Mid-Atlantic Permanente Med. Group, P.C.*, -- F. Supp. 2d --, 2010 WL 3118641, *15-16 (D.D.C. Aug. 9, 2010) (finding that neither the HCQIA nor a Maryland peer review statute "present a clear mandate of public policy" to form the basis of a wrongful discharge claim); *Mitchell v. Mid-Ohio Emergency Servs., LLC*, 2004 WL 2803419, *6 (Ohio Ct. App. Sep. 30, 2004) (unpublished) (finding no clear public policy in state peer review statute for physician who externally complained about substandard patient care);  *Kallich v. North Iowa Anesthesia Assocs., P.C.*, 179 F. Supp. 2d 1043, 1050-51 (N.D. Iowa 2002) (casting "considerable doubt" on the proposition that public policy concerning competent healthcare would protect a physician who expressed concerns about patient care and the handling of patients by his colleagues);

*Wall v. Ohio Permanente Med. Group, Inc.*, 695 N.E.2d 1233, 1244 (Ohio Ct. App. 1997) (finding that the plaintiff sought improperly to expand liability by invoking the Ohio peer review statute – which by its terms limits liability – to support a wrongful discharge claim).

Even viewing the claim in the light most favorable to Plaintiff, the Court does not regard the Plaintiff's "rights," either to participate in peer review proceedings or to oppose peer review proceedings he considers lacking, as rights that truly impact the public. Certainly, Plaintiff's efforts in this regard arose from proceedings reviewing his own competence, which he believed were improper; thus, Plaintiff sought to "improve" the process assumably for his own, and possibly for his colleagues', protection. Under these circumstances, the Court discerns no clearly expressed public policy that would be adversely impacted if Plaintiff was terminated for his opposition to the hospital's peer review procedures.

Consequently, the Court finds as a matter of law that Plaintiff has failed to demonstrate any issues of fact material to a determination as to whether he has presented a clear mandate of public policy, and Defendants' motion is **granted** as to Plaintiff's Third Claim for Relief.

B.   Intentional Interference with Contract

Plaintiff claims that Defendants Nix, Soper, Elliff, Bonelli and Joy intentionally interfered with his employment by inducing Banner to terminate his employment contract after Defendants allegedly failed to undertake and investigate allegations against Plaintiff in good faith and failed to follow hospital policies. Docket #90 at 29.

The tort of intentional interference with contractual relations is defined as: "One who intentionally and improperly interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." *Memorial Gardens, Inc. v. Olympian Sales & Mgmt.*

*Consultants, Inc.*, 690 P.2d 207, 210 (Colo. 1984) (citing Restatement (Second) of Torts § 766 (1979)).  Thus, to be liable for intentional interference with contract, a defendant must (1) be aware of a contract between two parties, (2) intend that one of the parties breach the contract, (3) and induce the party to breach or make it impossible for the party to perform the contract." *Krystkowiak v. W.O. Brisben Cos., Inc.*, 90 P.3d 859, 871 (Colo. 2004) (en banc).

The defendant must also have acted "improperly" in causing the result.  *Id.*  Factors to be considered in determining whether a defendant has acted improperly include: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relation between the parties.  *Id.* at 871 n.13.

There is no dispute that Plaintiff's employment with Banner was governed by a Physician's Employment Contract that was due to expire in July 2009.  Docket #94 at 7.  It is also undisputed that the individual Defendants knew of the existence of the contract.  *Id.*

Defendants argue that, because the contract contains a "terminable at will" clause and Banner fully performed under the contract by invoking the 90-day notice of termination, the contract was not breached and Plaintiff's intentional interference claim fails as a matter of law.  *Id.* at 8-9.  The Court disagrees.

Contracts containing terminable-at-will clauses are entitled to protection from tortious interference by third parties.  *Bithell v. Western Care Corp.*, 762 P.2d 708, 712 (Colo. App. 1988). "Until terminated, an at will contract is valid and subsisting, and a stranger to the contract has no right to interfere improperly with it." *Zappa v. Seiver*, 706 P.2d 440, 442 (Colo. App. 1985) (citing Restatement (Second) of Torts § 766, comment g (1979)); *see also Cronk v. Intermountain Rural*

*Elec. Ass'n*, 765 P.2d 619, 623 (Colo. App. 1988) (finding summary judgment improper on claim for tortious interference with at-will employment).

Defendants' reliance on *Hertz v. Luzenac Group*, 576 F.3d 1103 (10th Cir. 2009) and *Radiology Prof'l Corp. v. Trinidad Area Health Ass'n*, 577 P.2d 748 (Colo. 1978) is misplaced. In both cases, the courts found no interference with "nonexclusive" service contracts, which the courts determined were not breached since the complaining parties did not have an exclusive right to provide the services set forth in the contracts at issue. The contract here involves the Plaintiff exclusively and governs the parties' agreement for the Plaintiff's medical services. The Court does not view the contract as "nonexclusive" simply because it contains a terminable-at-will clause. Thus, the Court finds that, as a matter of law, the Plaintiff may pursue a claim for intentional interference with his "at-will" employment contract. Accordingly, the Court must analyze whether there exist disputed facts material to the determination of whether Defendants intentionally interfered with the employment contract.

Plaintiff contends that Defendants Elliff, Nix, Bonelli, Soper and Joy "engaged in a fourteen month campaign of ill-informed, unlawful and improper investigations, findings, and harassment which resulted in the outcome they sought - the termination of Ryskin's employment at SRMC." Docket #90 at 30. In his affidavit, Plaintiff testifies that Defendants Elliff, Nix, Bonelli and Soper had conflicts of interest in the roles they were serving, displayed personal bias against him, failed to adequately investigate the allegations against him, failed to follow the Peer Review Policy by conducting peer review meetings of his cases without his presence, and refused to inform him of the allegations with sufficient notice to enable him to respond completely and sufficiently inform the investigations. Pl. Exh. 18 at ¶ 38. Moreover, Plaintiff claims that, in 2008, Defendant Elliff took no action on his proposals to amend the bylaws to change the peer review proceedings and, when he presented his proposals at the general staff meeting, Defendants Elliff, Nix, Bonelli and Soper

attempted to minimize his concerns. *Id.* at ¶ 46. In addition, Plaintiff asserts that, after his proposals were approved by a vote of the medical staff in June 2008, Defendant Joy never submitted the proposals to the SRMC Governing Board for approval. *Id.* at ¶ 51. Plaintiff alleges that Defendant Nix participated on the Credentials Committee which recommended that his request for a two-year reappointment be denied, and that all individual Defendants participated in the November 2008 MEC meeting in which the committee recommended to limit his request for reappointment to three months. *Id.* at ¶ 54. Plaintiff contends that, through these processes, none of the Defendants notified him of any action or sought his input. *Id.* at ¶ 55. Finally, Plaintiff states that in a December 9, 2008 meeting, Defendant Joy raised issues of complaints made against him, but "provided no names, dates or other information that would enable me to respond." *Id.* at ¶ 61.

Defendants deny Plaintiff's allegations and claim that Defendants' motivations were legitimate and their conduct proper. Defendants identify a number of facts in rebuttal to Plaintiff's claims. However, the Court finds that Plaintiff has provided sufficient evidence to raise genuine issues of fact material to the determination of whether Defendants' intentions were proper and whether Defendants, by their actions, interfered with Plaintiff's employment. Following the fall 2007 investigations of Plaintiff's medical competence, Plaintiff outwardly opposed the MEC's peer review procedures and worked to change them. Shortly thereafter, Defendant Nix and the Credentials Committee recommended denial of Plaintiff's request for reappointment, then the MEC recommended only three months' renewal to investigate additional "issues" with Plaintiff's medical competence, which were summarily dropped upon the 90-day notice of termination. A reasonable jury might conclude that Defendants acted improperly and caused a premature termination of Plaintiff's employment contract.

Defendants argue that Joy, as a corporate agent of SRMC, can be found liable only if she is "solely" motivated by a desire to harm Plaintiff *(see Trimble v. City & Cnty. of Denver*, 697 P.2d

22

716, 726 (Colo. 1985) (superceded by statute on other grounds)), and that the Plaintiff has failed to provide evidence of this heightened showing.  The Court disagrees.  Plaintiff's allegations that Joy never submitted his proposals for the bylaws amendments, participated in the November 2008 MEC meeting, and called him into the December 9, 2008 meeting to raise additional complaints without providing him a full opportunity to respond, suffice to raise issues of material fact as to whether Joy was motivated to end Plaintiff's employment.

Defendants also claim that Plaintiff's allegations against Nix, Soper, Bonelli and Elliff are conclusory and not supported by facts in the record.  However, in so doing, Defendants simply argue facts at issue claiming Plaintiff "has no evidence."  Clearly, the Court may not resolve such factual issues, particularly those concerning motivation, on summary judgment.  *See Cronk*, 765 P.2d at 623 ("Motivation is a question of fact.").

Consequently, Defendants' motion is **denied** as to Plaintiff's First Claim for Relief.

C.    <u>Intentional Interference with Prospective Business Advantage</u>

Colorado courts have adopted § 766B of the Restatement (Second) of Torts setting forth the tort of intentional interference with prospective business relations.  *See Amoco Oil Co. v. Ervin,* 908 P.2d 493 (Colo. 1995); *Dolton v. Capitol Fed. Sav. & Loan Ass'n,* 642 P.2d 21 (Colo. App. 1981). The tort is defined as:

> One who intentionally and improperly interferes with another's prospective contractual relation ... is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B (1979).  While the existence of an underlying contract is not required for this tort, there must be a showing of improper and intentional interference by the

defendant that prevents the formation of a contract between the plaintiff and a third party. *MDM Group Assocs., Inc. v. CX Reinsurance Co.*, 165 P.3d 882, 885 (Colo. App. 2007).

Viewing the claim in the light most favorable to the Plaintiff, the Court finds that he cannot establish the requisite intent necessary to prove the tort. According to comment d of § 766B of the Restatement of Torts (adopted in Colorado), "interference with the other's prospective business relation is intentional if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." Restatement (Second) of Torts § 766B, comment d (1979). Here, Plaintiff has testified that he never spoke with Joy about his plans to start a private practice (Defs. Exh. A-5 at 305: 5-10), nor to the other individual Defendants except Soper (*id.* at 313: 9-25, 314:1-5; 342: 8-11; 361: 5-8). Thus, Plaintiff cannot show that Nix, Bonelli, Elliff and Joy knew that their actions in 2008 would restrict his ability to establish a private practice serving patients in Sterling.[2]

However, even if Soper had knowledge of Plaintiff's desire to open a private practice, Plaintiff cannot show the existence of a prospective business relationship. "Interference with 'another's prospective contractual relation' is tortious only if there is a reasonable likelihood or reasonable probability that a contract would have resulted." *Id.* at 886 (citing *Klein v. Grynberg*, 44 F.3d 1497, 1506 (10th Cir. 1995) (finding there must be something beyond "mere hope")).

In *Klein*, the plaintiff invented a security device for computer hardware and alleged that defendant engaged in a course of conduct to interfere with the formation of contracts between the plaintiff and potential financiers of the invention. *Klein*, 44 F.3d at 1505-06. The Tenth Circuit

---

[2]Plaintiff argues that Defendants have improperly added a "knowledge" element to this tort. However, while a Colorado plaintiff need not establish that a defendant knew about a *specific* prospective relation (s*ee Personnel Dep't, Inc. v. Professional Staff*, 297 F. App'x 773, 778 (10th Cir. 2008)), the plaintiff must prove that the defendant "<u>intentionally</u> interfered," or that the defendant knew his improper action was certain, or substantially certain, to prevent or preclude prospective relations.

affirmed the district court's judgment in favor of defendant finding that the plaintiff had no ongoing relationships with any investor and offered no evidence that any of the prospective investors had the intent to finance his invention. *Id.* at 1506. Thus, the court concluded that the evidence did not support a finding that plaintiff enjoyed a reasonable probability of receiving any economic benefits from the investors.

Likewise, in *Hertz*, the Tenth Circuit upheld the district court's dismissal of a tortious interference claim where the plaintiff failed to demonstrate more than a "mere hope" of engaging in any future business deals with a third party. *Hertz*, 576 F.3d at 1119. Where the third party expressed only an interest in the plaintiff's invention but stated that it had other priorities and would consider the invention in several months, the court found that "while [plaintiff] certainly wanted to establish a continuing relationship with [third party], there is no evidence to suggest that [third party] shared [plaintiff's] desire." *Id.* at 1120; *see also Plaza Esteban v. La Casa Nino, Inc.*, 738 P.2d 410, 412 (Colo. App. 1987), *rev'd on other grounds*, 762 P.2d 669 (Colo. 1988) (upholding a trial court's finding that, because there was no firm offer of a deal between the third party defendant and a contracting party, the third party plaintiff's claim for tortious interference was "unsupported by the evidence").

Here, Plaintiff contends that he took steps consistent with a goal of establishing a private practice in Sterling including receiving applications from carriers of local heath insurance plans, establishing a professional corporation, and obtaining training and privileges in liposuction to offer the service as part of his private medical practice. Docket #90 at 46. Plaintiff concludes that he has "presented ample evidence to support the existence of a reasonable likelihood that he planned to leave his employment with Banner to open a private practice and that Defendants interfered with that plan by restricting his privileges and threatening to deny them, which forced his decision not to apply for additional privileges to avoid the possibility of a denial which would have led to a report

to the State Medical Board and the National Practitioner Database." *Id.*  The evidence is to the contrary.

First, the question in this case is not whether Defendants interfered with Plaintiff's "plan" to open a private practice, but whether Defendants interfered with Plaintiff's prospective business relations with patients.

Second, despite Plaintiff's efforts to start a private practice in Sterling during the period 2005-2007, Plaintiff testified that he put his plan on hold after Joy was hired as Chief Executive Officer at SRMC, because she "was the fourth CEO that [he had] met and worked with since [he] joined Banner" and he "wanted to see what will happen."  Defs. Exh. A-5 at 161: 25, 162: 1-8.

Third, even if Plaintiff had continued with his efforts to start a private practice, he provides no evidence that the patients he saw at SRMC had any desire to continue to seek his medical care as a private physician. *See Hertz*, 576 F.3d at 1120.  Certainly, it is possible the patients may have simply continued to see Plaintiff's successor at SRMC or their own primary care physicians for treatment.  Thus, even viewing all evidence in the light most favorable to Plaintiff, the Court finds that, considering the Plaintiff's suspended efforts to establish a private practice and his lack of evidence of patients' intentions to seek his care as a private physician, Plaintiff has failed to provide sufficient evidence demonstrating genuine issues of fact as to whether he had a reasonable probability of engaging in future private business relations with patients in Sterling that was prevented by Defendants' actions in 2008.

Accordingly, Defendants' motion is **granted** as to Plaintiff's Fourth Claim for Relief.

D.    Conspiracy

Plaintiff brings his conspiracy claim against all Defendants[3] and alleges that "the physician

---

[3]The Court has determined that Banner is immune from suit on the civil conspiracy claim; thus, the Court proceeds to analyze this claim brought against the individual Defendants.

defendants recruited Defendant Joy to assist them in getting Ryskin's contract with Banner terminated for no credible reason and in a manner inconsistent with the requirements of the HCQIA and CPRA." Docket #90 at 48.

To prove a claim for civil conspiracy, the Plaintiff must show: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) an unlawful overt act; and (5) damages as to the proximate result. *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995). The Plaintiff must present evidence of an agreement; the court may not infer its existence. *Id.* "Additionally, the purpose of the conspiracy must involve an unlawful act or unlawful means. A party may not be held liable for doing in a proper manner that which it had a lawful right to do." *Id.*; *see also Magin v. DVCO Fuel Sys., Inc.*, 981 P.2d 673, 675 (Colo. App. 1999) ("liability may be established for civil conspiracy even where only lawful acts were performed if the purpose or goal is unlawful").

Here, Plaintiff alleges that Defendants Nix, Soper, Bonelli, Elliff and Joy conspired to interfere with his employment contract with Banner. The Court has already found that Plaintiff has provided evidence sufficient to raise genuine issues of fact material to his intentional interference with contract claim. *See Pittman v. Larson Distrib. Co.*, 724 P.2d 1379, 1390 (Colo. App. 1986). In addition, the evidence shows that these Defendants participated in the November 2008 MEC meeting in which Plaintiff's request for a two-year reappointment was limited to three months and that Joy's letter to Plaintiff notifying him of the MEC's action was copied to the Chair of the MEC, Defendant Elliff. *See Scott v. Hern*, 216 F.3d 897, 918 (10th Cir. 2000) (plaintiff must allege a "course of conduct and other circumstantial evidence providing some indicia of agreement in an unlawful means or end") (citations omitted). The questions as to whether Defendants were motivated and intended to interfere with Plaintiff's employment contract are fact questions for the jury.

Defendants' arguments do not prompt a different conclusion.  Defendants recite facts regarding the timing of patient and staff complaints in support of their position that they acted properly and in the scope of their duties.  They claim, "[i]n looking at these events it is as likely, if not more likely, that both the MEC and Ms. Joy became aware of complaints at approximately the same time and the MEC and Ms. Joy acted independently in fulfilling their respective duties." Docket #94 at 26.  Defendants' contentions simply raise fact questions that may not be resolved by summary judgment, but are more properly presented to a jury.

Defendant's motion is **denied** as to Plaintiff's Second Claim for Relief.

## CONCLUSION

Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, I therefore ORDER that Defendants' Joint Motion for Summary Judgment [filed August 30, 2010; docket #76] is **granted in part and denied in part** as follows:

1.      Defendants' motion is granted and the Court enters summary judgment in favor of Defendant Banner Health with respect to Plaintiff's Third Claim for Relief, Wrongful Discharge in Violation of Public Policy, and in favor of Defendants Nix, Bonelli, Soper, Elliff and Joy with respect to Plaintiff's Fourth Claim for Relief, Intentional Interference with Prospective Business Relations.

2.      Defendants' motion is denied and this action will proceed against Defendants Nix, Bonelli, Soper, Elliff and Joy with respect to Plaintiff's First Claim for Relief, Intentional Interference with Contract, and Second Claim for Relief, Civil Conspiracy.

Dated at Denver, Colorado this 9th day of November, 2010.

BY THE COURT:

Michael E. Hegarty

Michael E. Hegarty
United States Magistrate Judge